Filed 12/19/17

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE ex rel. MAHMOUD ALZAYAT, | E066471 |
| Plaintiff and Appellant, | (Super.Ct.No. INC1204627) |
| v. | OPINION |
| GERALD HEBB et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. David M. Chapman, Judge. Reversed.

English Lloyd & Armenta and Juan M. Armenta for Plaintiff and Appellant.

Rutan & Tucker, Duke F. Wahlquist and Proud Usahacharoenporn for Defendants and Appellants.

1

I

INTRODUCTION

Plaintiff Mahmoud Alzayat, on behalf of the People of the State of California, filed this qui tam action against his employer, Sunline Transit Agency, and his supervisor, Gerald Hebb, alleging a violation of the Insurance Frauds Prevention Act (IFPA or the Act).  (Ins. Code, § 1871 et seq.)  Alzayat alleged Hebb made false statements in an incident report submitted in response to Alzayat's claim for workers' compensation, and Hebb repeated those false statements in a deposition taken during the investigation into Alzayat's claim for compensation.  Hebb's false statements resulted in Alzayat's claim being initially denied.

Defendants filed motions for judgment on the pleadings contending:  (1) this lawsuit is based on allegedly false and fraudulent statements Hebb made in connection with a workers' compensation proceeding and is, therefore, barred by the litigation privilege under Civil Code[1] section 47, subdivision (b) (hereafter § 47(b)); and (2) Alzayat's claim is barred by the workers' compensation exclusivity rule.  The superior court concluded the workers' compensation exclusivity rule is inapplicable, but ruled the litigation privilege bars Alzayat's claim.  Therefore, the court granted the motions without leave to amend and entered judgment dismissing the lawsuit.

---

[1]  All additional unspecified statutory references are to the Civil Code.

Alzayat appeals from the judgment, contending the litigation privilege only applies to tort claims and not to statutory claims such as an action under the IFPA, and the IFPA is a specific statute that prevails over the general litigation privilege.

Defendants cross-appeal, arguing that, even if Alzayat's lawsuit is not barred by the litigation privilege, the superior court erred by not granting judgment on the pleadings on the ground that Alzayat's claim is barred by the workers' compensation exclusivity rule.

We agree with Alzayat that his lawsuit is not barred by the litigation privilege. The litigation privilege is broad, but it has its limits. Like any statute, Civil Code section 47(b) is subject to the rule of statutory construction that a particular provision prevails over a general one. (Civ. Code, § 3534; Code Civ. Proc., § 1859; *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1246 (*Action Apartment*).) The courts have concluded the litigation privilege does not bar an action filed under a more specific statute when application of the privilege would render the specific provision "significantly or wholly inoperable." (*Action Apartment*, at p. 1246.) The IFPA is a more specific statute than the litigation privilege, and application of the litigation privilege to claims under the IFPA—which in many cases will be based on communications that are otherwise privileged under Civil Code section 47(b)—would in large measure nullify the Act. Therefore, we conclude the litigation privilege does not bar Alzayat's claim.

We also conclude this lawsuit is not barred by the workers' compensation exclusivity rule. The Workers' Compensation Act (WCA; Lab. Code, § 3200 et seq.)

3

provides exclusive remedies for injuries to a worker arising out of his or her employment. Like any qui tam lawsuit, Alzayat's claim under the IFPA is based on an injury suffered by the People, not based on any injury he himself suffered. Therefore, the exclusivity rule is inapplicable.

The trial court erred by granting judgment on the pleadings for defendants, so we reverse the judgment.

## II.

## FACTS AND PROCEDURAL BACKGROUND

In conformity with the standard of review of an order granting a motion for judgment on the pleadings, we accept as true the facts pleaded in the complaint. (*Truong v. Orange County Sheriff's Dept.* (2005) 129 Cal.App.4th 1423, 1427.)

Sunline Transit Agency (Sunline) is a public entity that provides regional transportation services and oversight of other transportation entities such as taxi companies. Alzayat was employed by Sunline as a stops and zones technician, and in that capacity he maintained bus stop infrastructure. Hebb was Alzayat's supervisor.

Sometime before his current injury, Alzayat suffered a work-related lumbar injury and was later released back to work. On the day of the current injury, Alzayat was working on a bus stop and needed concrete mix to anchor some posts. The only available bags of concrete mix weighed 90 pounds. To avoid reinjuring his lumbar, Alzayat asked Hebb for permission to either break down a 90-pound bag into lighter ones or to have another employee help him lift the 90-pound bag. Hebb refused Alzayat's requests, and the two argued for about two minutes. Hebb ultimately ordered Alzayat to lift the 90-

4

pound bag by himself without breaking it down first. Alzayat complied and, immediately upon lifting the bag, Alzayat felt intense pain in his lumbar spine, and he partially collapsed. Alzayat dropped the bag and its contents spilled out. When Hebb asked Alzayat why he had dropped the bag, Alzayat complained he had injured his back when lifting the bag.

Alzayat was still in pain the next day, so he filled out a workers' compensation claim form about the incident. Some time thereafter, Hebb filled out a standard Sunline report for work injuries that is used in determining whether to accept or deny liability for workers' compensation claims. In the report, Hebb wrote he did not witness Alzayat's injury. Alzayat alleged this statement was false, because Hebb was an active participant in the incident.

Hebb was deposed during the investigation into Alzayat's workers' compensation claim. Hebb testified under oath that he had no conversation with Alzayat about the request to either break down the bag of concrete mix or to obtain help in lifting the bag. Hebb also denied having witnessed Alzayat injure himself when he lifted and then dropped the bag. Alzayat alleged Hebb knowingly provided false testimony because Hebb was present and had witnessed Alzayat's injury. In addition, Alzayat alleged Sunline adopted and ratified Hebb's misrepresentations, and Hebb and Sunline knew or should have known that Hebb's deposition testimony would be used in determining whether Alzayat's workers' compensation claim would be granted or denied.

Sunline's risk management authority denied Alzayat's workers' compensation claim based on Hebb's report and deposition testimony. Alzayat alleged Hebb's

5

misrepresentations were material in that a reasonable insurance carrier would consider

them important when determining whether to accept or deny liability for Alzayat's

injuries.[2]

Alzayat filed this lawsuit alleging Hebb's false statements in relation to Alzayat's

claim for workers' compensation benefits constituted violations of Penal Code

section 550, and formed predicate offenses for liability under the IFPA.[3]  Alzayat alleged

he is an "interested person" under the IFPA, and that he had direct and independent

knowledge of the information on which the lawsuit was based within the meaning of

---

[2]  The parties agree that Alzayat eventually received workers' compensation benefits for his back injury.

[3]  In their brief, defendants contend Alzayat pleaded a predicate violation of Penal Code section 550, subdivision (b)(3), which provides:  "It is unlawful to do, or to knowingly assist or conspire with any person to . . . [¶] . . . [¶] [c]onceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled."  Not so.  The complaint pleaded more generally that Hebb's misrepresentations in the Sunline report and in his deposition testimony were "in violation of Penal Code § 550, which is a predicate offense for an action under the Insurance Frauds Prevention Act."
Alzayat relied on Penal Code section 550, subdivision (b)(3), in his opening brief in an earlier appeal and in an answer to defendants' petition for review in that proceeding. Based on the parties' briefs in that earlier appeal, this court addressed Penal Code section 550, subdivision (b)(3), in the context of the specific issue presented to us, viz, whether a self-insurance risk pool constitutes insurance for purposes of the IFPA. (*People ex rel. Alzayat v. Hebb et al.* (Dec. 17, 2015, E060593) [nonpub. opn.].)  This court had no occasion whatsoever to decide whether Alzayat could state a claim based on a predicate violation of Penal Code section 550, subdivision (b)(3), or whether Alzayat's IFPA lawsuit is limited to that specific predicate offense.  Defendants have not argued Alzayat is judicially estopped from asserting other predicate offenses under Penal Code section 550, and we decline to find estoppel on our own motion. (*Lee v. West Kern Water Dist.* (2016) 5 Cal.App.5th 606, 630 [equitable defense of judicial estoppel is subject to the forfeiture doctrine].)

Insurance Code section 1871.7, subdivision (h)(2)(B). On behalf of the People of the State of California, Alzayat prayed for a civil penalty against Hebb and Sunline of no less than $5,000 and no more than $10,000, an assessment of no more than three times the amount of his workers' compensation claim, attorney fees, and costs.

In their first motion for judgment on the pleadings, Hebb and Sunline argued self-insured risk pools, like Sunline's, are not considered insurance for purposes of the IFPA. The superior court agreed, granted the motion without leave to amend, and entered judgment for defendants. In an unpublished opinion, we concluded self-insured risk pools are subject to the IFPA and reversed the judgment. (*People ex rel. Alzayat v. Hebb et al.*, *supra*, E060593.)

On remand, Hebb and Sunline again moved for judgment on the pleadings. In their separate but identical motions, defendants argued Alzayat's lawsuit was based on communications Hebb made in the context of a workers' compensation proceeding and, therefore, the lawsuit is barred by the litigation privilege under section 47(b). Defendants also argued Alzayat's lawsuit seeks damages for injuries that he incurred in the workplace and is, therefore, barred by the workers' compensation exclusivity rule. In his opposition to Sunline's motion, Alzayat argued his lawsuit is not barred by the litigation privilege. Relying on *Action Apartment*, *supra*, 41 Cal.4th 1232, Alzayat argued the IFPA is a specific statute designed to combat workers' compensation fraud, and permitting the general litigation privilege to immunize communications the IFPA was designed to penalize would frustrate the purposes of the Act. Alzayat also argued his

7

claim under the IFPA is not barred by the workers' compensation exclusivity rule. Alzayat did not file an opposition to Hebb's motion.

In its tentative ruling, which became the final ruling, the superior court agreed with defendants that Alzayat's claim is barred by the litigation privilege. The court noted the litigation privilege is absolute, applies to quasi-judicial proceedings such as workers' compensation actions, and immunizes communications that have some logical relation to the proceeding and are made to achieve the objects of the litigation. Although the court acknowledged that the general litigation privilege must yield when immunity would render a more specific statute to be significantly or wholly inoperable, the court concluded application of the privilege in this case would not frustrate enforcement of the IFPA. According to the court, Penal Code section 550, which lists the predicate offenses for liability under the IFPA, "prohibits a wide array of conduct related to the false submission of insurance claims, most of which could arise before litigation is ever contemplated." The court gave two examples: causing a vehicular accident for the purpose of filing a false insurance claim, and misrepresenting an insured's state of domicile when obtaining motor vehicle insurance. Citing *People ex rel. Monterrey Mushrooms*, *Inc*. *v*. *Thompson* (2006) 136 Cal.App.4th 24 (*Thompson*), the court concluded the workers' compensation exclusivity rule does not bar an action under the IFPA, and rejected defendant's alternative basis for judgment on the pleadings. The court granted judgment on the pleadings for defendants without leave to amend and entered a judgment dismissing the lawsuit.

8

Alzayat timely appealed from the judgment. Defendants filed a protective cross-appeal from the order denying judgment on the pleadings based on the workers' compensation exclusivity rule.

III.

DISCUSSION

A. *Standards of Review*.

"A motion for judgment on the pleadings presents the question of whether 'the plaintiff's complaint state[s] facts sufficient to constitute a cause of action against the defendant.' [Citation.] The trial court generally considers only the allegations of the complaint, but may also consider matters that are subject to judicial notice. [Citation.] '"Moreover, the allegations must be liberally construed with a view to attaining substantial justice among the parties." [Citation.] "Our primary task is to determine whether the facts alleged provide the basis for a cause of action against defendants under any theory."' [Citation.] 'An appellate court independently reviews a trial court's order on such a motion.' [Citation.]" (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 272.)

Interpretation of Civil Code section 47, subdivision (b), and of the IFPA is a pure question of law that we review de novo. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) When the facts are not in dispute, the question of whether a cause of action is barred by the workers' compensation exclusivity rule is also a question of law we review de novo. (*Melendrez v. Ameron Internat. Corp.* (2015) 240 Cal.App.4th 632, 639 (*Melendrez*).)

9

B.      *Alzayat's Qui Tam Claim Under the IFPA Is Not Barred by the Litigation Privilege.*

Alzayat does not dispute that, in general, the litigation privilege bars tort liability for communications that are made in judicial and quasi-judicial proceedings such as a workers' compensation proceeding.  Rather, he argues the IFPA is an exception to the litigation privilege.  We agree.

1.      The IFPA.

The IFPA was in large measure designed to prevent workers' compensation insurance fraud, and the Act includes a number of legislative findings and declarations that are relevant here.  "Workers' compensation fraud harms employers by contributing to the increasingly high cost of workers' compensation insurance and self-insurance and harms employees by undermining the perceived legitimacy of all workers' compensation claims."  (Ins. Code, § 1871, subd. (d).)  Preventing workers' compensation fraud "may reduce the number of workers' compensation claims and claim payments thereby producing a commensurate reduction in workers' compensation costs," and "will assist in restoring confidence and faith in the workers' compensation system, and will facilitate expedient and full compensation for employees injured at the workplace."  (*Id*., subd. (e).)  In addition, "[t]he actions of employers who fraudulently underreport payroll or fail to report payroll for all employees to their insurance company in order to pay a lower workers' compensation premium result in significant additional premium costs and an unfair burden to honest employers and their employees."  (*Id*., subd. (f).)  Finally, "[t]he actions of employers who fraudulently fail to secure the payment of workers'

10

compensation as required by Section 3700 of the Labor Code harm employees, cause unfair competition for honest employers, and increase costs to taxpayers." (*Id.*, subd. (g).)

Any person who makes a false claim for workers' compensation benefits, or who presents a false or fraudulent statement in support of or in opposition to such a claim, is guilty of a felony wobbler. (Ins. Code, § 1871.4, subd. (b).) In addition, the IFPA provides for civil liability for various forms of workers' compensation insurance fraud. "Every person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation, as defined in Section 3207 of the Labor Code[4] or pursuant to a contract of insurance. The court shall have the power to grant other equitable relief, including temporary injunctive relief, as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public. The penalty prescribed in this paragraph shall be assessed for each fraudulent claim presented to an insurance company by a defendant and not for each violation." (Ins. Code, § 1871.7, subd. (b), hereafter Ins. Code, § 1871.7(b).)

Insurance Code section 1871.7, subdivision (a), makes it unlawful to use runners and cappers to procure clients or patients for the purpose of filing claims for insurance

---

**4** Labor Code section 3207 defines the term "compensation" for purposes of the WCA.

services or benefits. Penal Code section 549 makes it a crime to knowingly, or with reckless disregard for the truth, solicit, accept, or refer a client who intends to file a fraudulent claim for insurance benefits. Among other things, Penal Code section 550, subdivisions (a) and (b), criminalize making false claims for compensation or benefits and presenting or preparing false statements in support of or in opposition to a claim for compensation or benefits. Relevant here, Penal Code section 550, subdivision (b)(1), provides it is unlawful to "[p]resent or cause to be presented any written or oral statement as part of, *or in support of or opposition to*, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact." (Italics added.) Subdivision (b)(2) of the same section makes it a crime to knowingly "[p]repare or make" a false or misleading statement "to be presented to any insurer or any insurance claimant in connection with, *or in support of or opposition to*, any claim or payment or other benefit pursuant to an insurance policy." (Italics added.) Assisting or conspiring with another person to present or prepare such a false statement in support of or in opposition to a claim for compensation or benefits is also a crime. (Pen. Code, § 550, subd. (b).) Finally, Penal Code section 551 criminalizes paying consideration for the referral of clients to automotive repair shops for repairs covered by automobile insurance.

The IFPA's civil penalties are intended to be remedial and not punitive (Ins. Code, § 1871.7, subd. (c)), and they are not the exclusive remedies available for insurance fraud (*id*., subd. (k)). An action to recover civil penalties under the IFPA may be initiated by the district attorney or the insurance commissioner. (Ins. Code, § 1871.7, subd. (d).) In

12

addition, any "interested person," including an insurance company, may file such an action in the name of the People of the State of California. (*Id.*, subd. (e)(1).) A lawsuit filed on behalf of the state is called a qui tam action, and the interested person is called a relator. (*People ex rel. Strathmann v. Acacia Research Corp.* (2012) 210 Cal.App.4th 487, 500 (*Strathmann*); *People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538 (*Weitzman*).) The relator's complaint must be served on the district attorney and the insurance commissioner, who have 60 days to decide whether to intervene and proceed with the lawsuit. (Ins. Code, § 1871.7, subd. (e)(2).) If the district attorney and the insurance commissioner both decline to take over the action (*id.*, subd. (e)(4)(A)), the relator may proceed with the action and recover a bounty of 40 to 50 percent of the recovered proceeds, plus reasonable expenses and attorney fees (*id.*, subds. (e)(4)(B), (g)(2)(A); *Strathmann*, at p. 500).

Relying on *State of California ex rel. Metz v. Farmers Group, Inc.* (2007) 156 Cal.App.4th 1063 (*Metz*) and *State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442 (*Nee*), defendants contend the IFPA is concerned primarily with workers' compensation fraud by employees, and that its limited application to fraudulent statements made by employers or other persons in opposition to employee claims has no bearing here. Although those decisions concluded the IFPA was drafted primarily to address fraudulent claims for workers' compensation benefits filed by employees (*Metz*, at pp. 1068-1069; *Nee*, at pp. 448-449; accord, *State ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 413), they did not hold the IFPA is *only* concerned with fraudulent claims. To the contrary, Insurance Code

13

section 1871, subdivisions (f) and (g), specifically address the Legislature's concern about *employers* who fraudulently fail to comply with their obligations under the WCA.

The *Metz* and *Nee* courts held that the defendants in those cases—insurance companies and insurance company agents, affiliates, and exchanges—were not subject to criminal liability under Penal Code section 550 and, therefore, were not proper defendants under Insurance Code section 1871.7, subdivision (b). (*Metz*, *supra*, 156 Cal.App.4th at pp. 1070-1071; *Nee*, *supra*, 140 Cal.App.4th at pp. 450-452.) *Nee* concluded "the class of persons who violate [Penal Code sections 549, 550, or 551] are those who submit false or fraudulent claims to insurers." (*Nee*, at p. 450, fn. omitted.) By way of example, the court said Penal Code section 550, subdivisions (a)(1) through (a)(9) and (b)(3) and (b)(4) "specifically refer to the presentation of false or fraudulent claims for compensation or benefits," conduct the defendant insurer in that case was not alleged to have engaged in. (*Nee*, at p. 450; see *Metz*, at p. 1069.) At least one appellate court has concluded *Nee*'s limitation of Penal Code section 550 to the class of persons who file insurance claims is unpersuasive dictum.[5] (*People v. Butler* (2011) 195 Cal.App.4th 535, 540.) We need not decide whether *Nee* correctly interpreted the scope of Penal Code section 550. As stated,

---

[5] A number of courts have made statements regarding the elements for a violation of Penal Code section 550 that, if taken out of context, might support the suggestion in *Nee* that only persons who file claims for benefits are liable under that statute. (See, e.g., *People ex rel. Government Employees Ins. Co. v. Cruz* (2016) 244 Cal.App.4th 1184, 1193 ["The elements generally necessary to find a violation of Penal Code section 550 are (1) the defendant's knowing presentation of a false claim, (2) with the intent to defraud."].) Those courts had no occasion to determine whether Penal Code section 550, subdivision (b)(3), can be violated by anyone other than a person who submits a claim for benefits under an insurance policy and, therefore, do not support the dictum in *Nee*.

*ante*, in footnote 2, we do not read Alzayat's complaint as being limited to the predicate offense of concealment in violation of Penal Code section 550, subdivision (b)(3). When reviewing a judgment on the pleadings, it is our duty to determine whether the complaint states a cause of action under *any* theory. (*Jacks v. City of Santa Barbara*, *supra*, 3 Cal.5th at p. 272.)

As defendants must concede, *Nee* concluded, albeit in dicta, that Penal Code section 550, subdivision (b)(1) and (b)(2), "extend liability to persons other than those who actually file the suspect claim" for workers' compensation benefits. (*Nee*, *supra*, 140 Cal.App.4th at p. 450; see *Metz*, *supra*, 156 Cal.App.4th at p. 1070.) "These provisions might apply, for example, to a doctor who submits false documentation in support of an employee's claim for benefits under a workers' compensation policy, *or an employer who makes a false statement in opposition to such a claim*, or to a person who files a false statement in support of an insured's claim under a disability policy, and extends as well to anyone who knowingly assists or conspires to do any of these things." (*Nee*, at p. 450, italics added; see *Metz*, at p. 1070.)

We conclude the latter bit of dicta from *Nee* is well considered and persuasive. (Cf. *PGA West Residential Assn.*, *Inc*. *v. Hulven Internat.*, *Inc*. (2017) 14 Cal.App.5th 156, 171.) A false report submitted by or prepared to be submitted by an employer in response to a claim for workers' compensation insurance benefits, fraudulently disputing liability for the claimed injury, *is* a false oral or written statement "in support of or opposition to" a claim for benefits within the meaning of Penal Code section 550, subdivision (b)(1) and (b)(2). That is exactly what Alzayat alleged in his complaint.

15

Therefore, we conclude Alzayat pleaded predicate offenses under Penal Code section 550, subdivision (b)(1) and/or (b)(2).

Finally, relying on *State ex rel. Wilson v. Superior Court* (2014) 227 Cal.App.4th 579 (*Wilson*), defendants argued for the first time at oral argument that civil penalties under Insurance Code section 1871.7(b) are only available to remedy the filing of fraudulent claims for compensation. Arguments made for the first time at oral argument are generally waived. (*Bonfigli v. Strachan* (2011) 192 Cal.App.4th 1302, 1311, fn. 4.) In any event, we do not agree with such a cabined reading of the statute.

Insurance Code section 1871.7(b) has three sentences. The first sentence provides that a "civil penalty" of no less than $5,000 and no more than $10,000, plus an assessment of no more than three times the amount of the underlying claim for compensation, "shall" be imposed on "[e]very person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code." As noted, *ante*, sections 549 through 551 of the Penal Code criminalize various forms of insurance fraud, including but not limited to the filing of a fraudulent claim. The second sentence of Insurance Code section 1871.7(b) provides that the superior court also has the power to grant equitable or injunctive relief as necessary to protect the public from insurance fraud. Finally, the third sentence provides that the "civil penalty" mentioned in the first sentence "shall be assessed for each fraudulent claim presented to an insurance company by a defendant and not for each violation."

Defendants argue that, notwithstanding the incorporation of *all* predicate violations of Penal Code sections 549 through 551 into the first sentence of Insurance

16

Code section 1871.7(b), the third sentence limits penalties to the *sole* predicate violation of filing a fraudulent claim, and that the only available remedies for other predicate violations is the equitable and injunctive relief mentioned in the second sentence. But "[t]he meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735; accord, *Weitzman*, *supra*, 107 Cal.App.4th at p. 544.) The most reasonable reading of Insurance Code section 1871.7(b), which harmonizes all three sentences, is that the "civil penalty" mentioned in the first sentence may only be assessed once per underlying claim for compensation regardless of how many predicate violations occurred, and the equitable and injunctive remedies mentioned in the second sentence are supplementary to the civil penalty. In other words, rather than limiting the IFPA's statutory penalties to one type of predicate violation, the most reasonable reading of Insurance Code section 1871.7(b) is that it limits the *number* of penalties that can be imposed for insurance fraud violations related to a single claim.

If the Legislature had intended the IFPA's civil penalties to be limited to defendants who present false claims to insurance companies, as defendants contend, it could have made the point more clearly by amending the first sentence of Insurance Code section 1871.7(b) to only incorporate the predicate offense of filing a fraudulent claim in violation of Penal Code section 550, subdivision (a). Other changes to the statute that would more clearly express an intent to limit penalties to fraudulent claims would include: (1) amending the second sentence of Insurance Code section 1871.7(b) to

17

expressly provide that equitable and injunctive relief is the sole remedy for insurance fraud in violation of Penal Code sections 549, 550, subdivision (b), and 551, but is a *supplementary* remedy for filing a fraudulent insurance claim in violation of Penal Code section 550, subdivision (a); and (2) amending the third sentence to clearly state that the civil penalties mentioned in the first sentence are only available to remedy the filing of a fraudulent claim in violation of Penal Code section 550, subdivision (a).  The Legislature did neither of those things, and the structure of the paragraph as a whole simply does not support the interpretation given to it by defendants.

Even if we were to agree with defendants that the third sentence of Insurance Code section 1871.7(b) could be read to limit the civil penalties mentioned in the first sentence to the filing of fraudulent claims, such a reading would render the statute ambiguous because, as already noted, *ante*, on its face the first sentence more broadly provides for civil penalties to remedy all forms of insurance fraud proscribed by Penal Code sections 549 through 551.  Normally, we only look no further than the plain language of a statute when determining the Legislature's intent.  (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340.)  However, "[i]f we find the statutory language ambiguous or subject to more than one interpretation, we may look to extrinsic aids, including legislative history or purpose to inform our views.  [Citation.]"  (*John v. Superior Court* (2016) 63 Cal.4th 91, 96.)

The available legislative history supports our reading of the statute.  Since 1995, the first sentence of Insurance Code section 1871.7(b) has incorporated Penal Code sections 549 through 551 *in toto*.  (Stats. 1995, ch. 574, § 2, p. 4427.)  The third sentence

18

was added to section 1871.7(b) in 1999, when the Legislature adopted a number of amendments to the IFPA. (Stats. 1999, ch. 885, § 2, p. 6345.) One of the main purposes of those amendments was to change the distribution of penalties recovered in civil actions filed by insurance companies, but taken over by the Attorney General, the district attorney, or the Insurance Commissioner. (Assem. Com. on Insurance, Analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as amended Apr. 19, 1999, p. 1.)[6]

An early version of the bill to amend the IFPA would have added a new subdivision (g)(1)(B) to Insurance Code section 1871.7, to provide that insurance company relators would be entitled to "receive at least 75 percent but not more than 85 percent of the proceeds of the action or settlement of the claim depending upon the extent to which the insurer substantially contributed to the prosecution of the action." (Assem. Bill No. 1050 (1999-2000 Reg. Sess.) § 2, p. 9, as amended Apr. 19, 1999, italics omitted.)[7] Along the same lines, the same version of the bill would have amended the first sentence of section 1871.7(b) to read: "Every person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty *for each violation* of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not

[6] Available at <http://www.leginfo.ca.gov/pub/99-00/bill/asm/ab_1001-1050/ab_1050_cfa_19990421_082354_asm_comm.html> (as of Dec. 19, 2017). On our own motion, we take judicial notice of the legislative history materials mentioned in this opinion related to Assembly Bill No. 1050 (1999-2000 Reg. Sess.), which amended Insurance Code section 1871.7. (Evid. Code, §§ 452, 459.)

[7] Available at <http://www.leginfo.ca.gov/pub/99-00/bill/asm/ab_1001-1050/ab_1050_bill_19990419_amended_asm.pdf> (as of Dec. 19, 2017).

19

more than three times the amount of each claim for compensation, as defined in Section 3207 of the Labor Code or pursuant to a contract of insurance." (Assem. Bill No. 1050 (1999-2000 Reg. Sess.), *supra*, § 2, pp. 4-5, as amended Apr. 19, 1999.) Note that the proposed amendment to the first sentence spoke of civil penalties for "each violation," and not for "each fraudulent claim."

Clearly such a proposed distribution of the civil penalty to insurance companies was seen as too generous, because as Assembly Bill No. 1050 proceeded through further amendments, the provision specifically addressing distribution of penalties to insurance companies was eliminated entirely. In its place, the amended bill more modestly increased the distribution of penalties to *any person* who initiated a civil lawsuit under the IFPA that was taken over by the government. (Assem. Bill No. 1050 (1999-2000 Reg. Sess.) § 2, as amended May 19, 1999.)[8] At the same time, the bill was amended to eliminate a windfall to relators by limiting the civil penalty to one per claim, rather than one per predicate violation. It was at this point that the third sentence of Insurance Code section 1871.7(b), with its reference to "each fraudulent claim," was introduced. (Assem. Bill No. 1050 (1999-2000 Reg. Sess.), *supra*, § 2, p. 5, as amended May 19, 1999.) That language remained unchanged in the final bill signed by the Governor (Stats. 1999, ch. 885, § 2, p. 6345), and it has not been amended since. (See Stats. 2010, ch. 400, § 26.)

Nothing in the legislative history to the 1999 amendments to Insurance Code section 1871.7 suggests that the Legislature intended to limit the assessment of penalties

---

[8] Available at <http://www.leginfo.ca.gov/pub/99-00/bill/asm/ab_1001-1050/ab_1050_bill_19990519_amended_asm.pdf> (as of Dec. 19, 2017).

20

to persons who fraudulently file insurance claims. To repeat, if that was its intent the Legislature could have easily amended the first sentence of section 1871.7(b) to limit the incorporation of predicate offenses. Because the addition of the third sentence to the statute related specifically to the Legislature's intent to adopt a proper *distribution* of the penalties recovered, and not to any intent to limit the *type of predicate violation* that would give rise to penalties in the first place, we decline to read section 1871.7(b) as narrowly as defendants suggest. Therefore, we respectfully disagree with the court in *Wilson*, which held the addition of the third sentence to section 1871.7(b), did limit penalties to persons who file fraudulent claims with insurance companies. (*Wilson*, *supra*, 227 Cal.App.4th at pp. 595-597.)

### 2. The litigation privilege.

Defendants contend that, even if Alzayat pleaded predicate offenses under Penal Code section 550 for purposes of civil liability under the IFPA, those offenses were based on communications that are absolutely privileged under Civil Code section 47(b).

"The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that a 'publication or broadcast' made as part of a 'judicial proceeding' is privileged. This privilege is absolute in nature, applying 'to *all* publications, irrespective of their maliciousness.' (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 216 . . . .) 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' (*Id*. at p. 212.) The privilege 'is not limited to statements made during a

21

trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.' (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057 . . . .)" (*Action Apartment*, *supra*, 41 Cal.4th at p. 1241.)

"'The principal purpose of [Civil Code] section [47, subdivision (b)] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.' (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 213 . . . .) Additionally, the privilege promotes effective judicial proceedings by encouraging '"open channels of communication and the presentation of evidence"' without the external threat of liability (*ibid*.), and 'by encouraging attorneys to zealously protect their clients' interests.' (*Id*. at p. 214.) 'Finally, in immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result.' (*Ibid*.)" (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 321-322.)

In the trial court and in their briefs on appeal, defendants argue this court's decision in *Harris v. King* (1998) 60 Cal.App.4th 1185 (*Harris*) is dispositive and mandates dismissal of Alzayat's suit. The plaintiff in *Harris* sued a physician alleging he submitted false and defamatory medical reports to the State Compensation Insurance Fund, which resulted in the temporary termination of the plaintiff's disability and rehabilitation benefits. (*Id*. at pp. 1186-1187.) The plaintiff alleged causes of action for

22

general negligence, fraud, and libel, and prayed for general and punitive damages. (*Id*. at p. 1187.)

On appeal, this court concluded the trial court properly sustained a demurrer to the complaint without leave to amend because the plaintiff's claims were barred by the litigation privilege. "[Section 47(b)] creates a privilege for the report prepared by King. That section provides that 'A privileged publication . . . is one made: [¶] . . . [¶] (b) In any . . . (2) judicial proceeding . . . .' That privilege is absolute [citation], and applies to communications involving quasi-judicial proceedings, including workers' compensation proceedings. [Citation.] [¶] Harris alleged he was receiving workers' compensation benefits as the result of a work-related injury. In connection with that proceeding, King communicated his report to the workers' compensation insurance carrier. King's communication satisfies the requirements for application of the litigation privilege because it was made in a quasi-judicial proceeding, by participants authorized by law to achieve the objects of the litigation, and the communication had a logical relation to that proceeding. [Citation.] The King report is therefore absolutely privileged and is not actionable even if prepared and communicated maliciously and with knowledge of its falsity. [Citation.]" (*Harris*, *supra*, 60 Cal.App.4th at pp. 1187-1188.)

At first blush, *Harris* would appear to support defendants' contention that, because Hebb's alleged misrepresentations were made in the context of a workers' compensation insurance proceeding, Alzayat's lawsuit is barred by the litigation privilege. Alzayat argues, however, our decision in *Harris* does not compel dismissal of his IFPA claim because: (1) the litigation privilege applies to common law tort causes of action and not

23

to claims under remedial statutory schemes, and (2) application of the general litigation privilege is inappropriate when it will render a more specific statute to be wholly or significantly inoperable. Alzayat's first argument is dubious at best,[9] but we need not address it further because we conclude the IFPA is an exception to the privilege.

### 3. Exceptions to the litigation privilege.

As defendants point out, Alzayat cited no authority in his briefs for the proposition that the litigation privilege does not apply when it is inconsistent with, and would render ineffective, a more specific statute.[10] In their brief, defendants contend they are unaware of any controlling authority that supports Alzayat's argument and raise the stakes by boldly asserting "[t]here is not a single potential cause of action that could conceivably" be exempt from the litigation privilege. Quite to the contrary, there is ample published authority for the proposition that the general litigation privilege must yield when its application will render a more specific law to be wholly or significantly inoperable.

In *Begier v. Strom* (1996) 46 Cal.App.4th 877 (*Begier*), while a couple were in the midst of a marital dissolution action, the wife filed a police report falsely accusing her

---

[9] The litigation privilege "has . . . been interpreted to preclude constitutional and statutory causes of action. [Citation.]" (*People v. Persolve*, *LLC* (2013) 218 Cal.App.4th 1267, 1274 (*Persolve*).)

[10] "Each brief must: [¶] . . . [¶] State each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).) Issues not supported by citation to legal authority are subject to forfeiture. (*Needelman v. DeWolf Realty Co.*, *Inc.* (2015) 239 Cal.App.4th 750, 762.) Because the issue of whether the litigation privilege preempts the IFPA is a pure question of law, and because Alzayat cited *Action Apartment* (discussed *post*) in his opposition to Sunline's motion in the trial court, we exercise our discretion to address it despite Alzayat's noncomplying brief.

24

husband of sexually abusing their young daughter and repeated the false accusation within the dissolution proceeding. (*Id*. at p. 881.) The husband thereupon sued his former wife for malicious prosecution and intentional infliction of emotional distress, and the wife successfully demurred to the emotional distress claim contending it was based on privileged communications and was, therefore, barred by section 47(b). (*Begier*, at p. 881.) On appeal, the husband conceded the wife's false accusations made in the context of the dissolution proceeding were privileged, but he argued the false police report was not privileged. (*Id*. at p. 882.) Without deciding whether false police reports are absolutely privileged, the court held the litigation privilege was preempted in that case by the Child Abuse and Neglect Reporting Act (CANRA; Pen. Code, § 11164 et seq.). (*Begier*, at pp. 882-883.)

The purpose of CANRA is to protect children from abuse or neglect, and to that end it requires certain classes of individuals (mandatory reporters) to report known or suspected child abuse or neglect to a child protective agency. (Pen. Code, § 11166.) Failure to report known or suspected child abuse or neglect by a mandatory reporter is a misdemeanor. (*Id*., subd. (c).) Mandatory reporters are absolutely immune from criminal or civil liability for making a false report of child abuse or neglect. (Pen. Code, § 11172, subd. (a).) Nonmandatory reporters are entitled to qualified immunity for making a false report unless it is proven the reporter knew the report was false or made the report with reckless disregard for the truth or falsity of the report, in which case they are liable for damages caused by the false report. (*Ibid*.)

*Begier* agreed with the husband that "the Legislature's direction in Penal Code section 11172 that a person who knowingly makes a false report of child abuse 'is liable for any damages caused' creates a limited exception to the privilege." (*Begier*, *supra*, 46 Cal.App.4th at p. 884.) The court "discern[ed] within [CANRA] a legislative effort to balance, on the one hand, the public interest in ferreting out cases of child abuse so that the child victims can be protected from harm and, on the other hand, the policy of protecting the reputations of those who might be falsely accused. [Citation.] The Legislature has struck that balance by withholding immunity from those who knowingly make false reports of child abuse." (*Begier*, at p. 885, fn. omitted.) Application of the litigation privilege to knowingly made false reports of child sexual abuse, the court noted, "would essentially nullify the Legislature's determination that liability should attach." (*Ibid.*) Mindful of its duty "to read statutes with reference to the whole system of law and to avoid rendering a statute meaningless and ineffective," the *Begier* court held "that the statutory privilege of Civil Code section 47, subdivision (b), does not immunize a party who would otherwise be liable under Penal Code section 11172, subdivision (a)." (*Begier*, at p. 885; see *Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1577 [reaffirming the *Begier* holding that liability under CANRA for false reports of child sexual abuse preempts litigation privilege].)

In *Action Apartment*, the plaintiff argued a tenant harassment ordinance enacted by the City of Santa Monica, which established criminal and civil liability for maliciously serving an eviction notice or filing an unlawful detainer action without a reasonable factual or legal basis, was preempted by the litigation privilege. (*Action Apartment*, *supra*, 41 Cal.4th at pp. 1239-1240.) Although our Supreme Court stated the litigation privilege is broad, the court acknowledged the privilege "is not without limit[s]" and cited claims for malicious prosecution, certain criminal prosecutions and regulatory enforcement proceedings, as examples of actions that are exempt from the litigation privilege. (*Id*. at pp. 1242, 1245-1246.) Those exceptions "involved suits brought under state laws, each of which makes clear that the Legislature did not intend its enforcement to be barred by the litigation privilege." (*Id*. at p. 1245; see *id*. at p. 1247 ["the Legislature remains free to create exceptions to the litigation privilege"].) "[R]ecognition of these exceptions to the litigation privilege," the court continued, "has been guided by the 'rule of statutory construction that particular provisions will prevail over general provisions.' [Citations.] [¶] Each of the above mentioned statutes is more specific than the litigation privilege and would be significantly or wholly inoperable if its enforcement were barred when in conflict with the privilege." (*Id*. at p. 1246.) Because local governments lack the authority to create their own exceptions to general state laws, the court declined to find an exception to the litigation privilege for the city's ordinance. (*Id*. at p. 1247.)

27

The plaintiff in *Komarova v. National Credit Acceptance*, *Inc.* (2009) 175 Cal.App.4th 324 (*Komarova*) sued alleging the defendant engaged in harassing and illegal debt collection practices in violation of the Rosenthal Fair Debt Collection Practices Act (Rosenthal Act; § 1788 et seq.), when it tried to collect a debt the plaintiff never incurred. (*Komarova*, at pp. 330-335.) On appeal, the defendant argued its conduct in attempting to collect the debt was privileged under section 47(b). (*Komarova*, at p. 337.) The Court of Appeal held "the privilege cannot be used to shield violations of the [Rosenthal] Act." (*Ibid*.)

Citing *Action Apartment*, *supra*, 41 Cal.4th 1232, *Komarova* stated our Supreme Court had already recognized exceptions to the litigation privilege for "statutes that (1) are 'more specific' than the privilege, and (2) would be 'significantly or wholly inoperable' if the privilege applied." (*Komarova*, *supra*, 175 Cal.App.4th at p. 339, citing *Action Apartment*, at p. 1246.) The defendant argued, however, that the litigation privilege was more specific than the Rosenthal Act "because the privilege 'only applies to communications related to litigation,' while the [Rosenthal] Act 'prohibits a broad range of practices in the context of debt collection,' 'whether in litigation or not.'" (*Komarova*, at p. 339.) The court was not persuaded. "[T]he privilege is implicated in all judicial and quasi-judicial proceedings and the [Rosenthal] Act is implicated in only the small subset of those proceedings that involve collection of consumer debts. We note that the Legislature specifically prohibited certain litigation related activity when it passed the Rosenthal Act in 1977, presumably aware of the extant broad litigation privilege in section 47." (*Komarova*, at pp. 339-340.)

28

The court recognized, however, that whether application of the litigation privilege would render the Rosenthal Act significantly inoperable was "a closer question." (*Komarova*, *supra*, 175 Cal.App.4th at p. 340.) The defendant argued there was no need to find an exception to the litigation privilege for Rosenthal Act claims because "'[t]he majority of debt collection attempts have nothing to do with litigation,'" "'[o]nly a small percentage of debts are ever litigated,' [and] the [Rosenthal] Act 'will still provide broad protection to consumers from improper attempts to collect debts even if all litigation related communications are excluded from [its] reach . . . .'" (*Komarova*, at p. 340.) Assuming for purposes of its decision that a significant percentage of debts are not litigated, the court nonetheless concluded application of the litigation privilege would render the Rosenthal Act significantly inoperable. "We must . . . be mindful of the ease with which the [Rosenthal] Act could be circumvented if the litigation privilege applied. In that event, unfair debt collection practices could be immunized merely by filing suit on the debt." (*Komarova*, at p. 340.) After acknowledging its duty to interpret remedial statutes broadly to effectuate their purpose, the court concluded the privilege would render the Rosenthal Act significantly inoperable and held the plaintiff's claims were not barred.[11] (*Komarova*, at p. 340.)

---

[11] The lower federal courts have uniformly followed *Komarova*, *supra*, 175 Cal.App.4th 324 and rejected application of the litigation privilege to claims under the Rosenthal Act. (E.g., *Holmes v. Electronic Document Processing, Inc.* (N.D. Cal. 2013) 966 F.Supp.2d 925, 935-937 [adopting *Komarova* holding that Rosenthal Act claims are not barred by litigation privilege, and noting that since issuance of *Komarova* "not 'a single federal court has found Rosenthal Act claims to be barred by the litigation privilege'"].)

Relying on the analysis in *Komarova*, 175 Cal.App.4th 324, the Court of Appeal in *Persolve* held an action filed by the People under the unfair competition law (Bus. & Prof. Code, § 17200), based on communications that allegedly violated specific provisions of the Rosenthal Act and the Fair Debt Collection Practices Act (FDCPA; 15 U.S.C. § 1692 et seq.), was not barred by the litigation privilege. (*Persolve*, *supra*, 218 Cal.App.4th at pp. 1275-1277.) "Applying the privilege to unlawful practices based on specific violations of the [Rosenthal Act] and the [FDCPA] would effectively render the protections afforded by those acts meaningless. . . . Civil statutes for the protection of the public should be interpreted broadly in favor of their protective purpose. Accordingly, the People's unfair competition law claims that are based on [the Rosenthal Act] and/or the [FDCPA] are not barred by the litigation privilege." (*Persolve*, at pp. 1276-1277, citing *Komarova*, at pp. 339-340.)

The question before the court in *Banuelos v. LA Investment*, *LLC* (2013) 219 Cal.App.4th 323 (*Banuelos*) was whether a claim for retaliatory eviction was barred by the litigation privilege. A landlord who files an unlawful detainer action in retaliation for the tenant lawfully organizing or participating in a tenant's association, or in retaliation for the tenant's lawful and peaceable exercise of her rights under law, is liable for damages. (§ 1942.5, subds. (c), (f); *Banuelos*, at p. 328.) The defendant argued "that insofar as section 1942.5 purports to allow a tenant to sue a landlord for 'bring[ing] an action to recover possession[,]' it is trumped by the 'litigation privilege' provision of section 47, subdivision (b)." (*Banuelos*, at p. 330.)

The court concluded section 1942.5, subdivisions (c) and (f), satisfied "both prongs" of the test under *Action Apartment*, *supra*, 41 Cal.4th 1232 for an exception to the litigation privilege. (*Banuelos*, *supra*, 219 Cal.App.4th at p. 332.) "The statute's reference to a landlord's liability 'in a civil action' for bringing 'an action to recover possession' in retaliation for a tenant's exercise of rights coupled with the provision recognizing a good faith defense 'at the trial or other hearing' demonstrates that the Legislature intended to create a cause of action for retaliatory eviction that is not barred by the litigation privilege. If the litigation privilege trumped a suit for retaliatory eviction under section 1942.5 the privilege would '"effectively immunize conduct that the [statute] prohibits"' (*Komarova v. National Credit Acceptance*, *Inc.*, *supra*, 175 Cal.App.4th at p. 338) thereby encouraging, rather than suppressing, '"the mischief at which it was directed. [Citation.]"' (*Barela v. Superior Court* [(1981)] 30 Cal.3d [244,] 251.)" (*Banuelos*, at p. 332.) In addition, the court noted "the right of tenants to be free from eviction actions brought by their landlords because the tenants 'lawfully and peaceably exercised [their] rights under the law' (§ 1942.5, subd. (c)) would be 'significantly or wholly inoperable if its enforcement were barred [by the litigation privilege].'" (*Banuelos*, at p. 332, quoting *Action Apartment*, at p. 1246.)

Therefore, the court held the Legislature intended that section 1942.5 not be nullified by the litigation privilege.[12] (*Banuelos*, at p. 335.)

More recently, a court found no exception for the litigation privilege where applying the privilege would advance rather than frustrate the purpose of a more specific statute. The plaintiff in *McNair v. City and County of San Francisco* (2016) 5 Cal.App.5th 1154 (*McNair*) had a commercial driver's license and was employed as a bus driver. A physician employed by the San Francisco Department of Public Health sent a letter to the

_____

**12** The *Banuelos* court declined to follow two decisions of the Court of Appeal that concluded the litigation privilege barred retaliatory eviction claims under section 1942.5. (*Banuelos*, *supra*, 219 Cal.App.4th at p. 333.) The plaintiff in *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467 (*Feldman*) alleged his landlord filed an unlawful detainer action in violation of a city ordinance. Relying on *Action Apartment*, the appellate court concluded the retaliatory eviction claim was barred by the litigation privilege. (*Feldman*, at p. 1486.) As *Banuelos* noted, "the [*Feldman*] court did not discuss the distinction between a tenant suing under a city ordinance, as in *Action Apartment*, and a tenant suing under the authority of coequal state statute, nor did it analyze section 1942.5 to determine whether it 'makes clear' that it is not barred by the litigation privilege." (*Banuelos*, at p. 333, citing *Action Apartment*, *supra*, 41 Cal.4th at p. 1246.)

The court in *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169 (*Wallace*) similarly held claims for retaliatory eviction under section 1942.5 were barred by the litigation privilege. (*Wallace*, at p. 1213, disapproved on another ground in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396, fn. 11.) "Like *Feldman*, the court [in *Wallace*] cited but did not discuss or analyze *Action Apartment* and the litigation privilege[,] nor did it distinguish between a city ordinance and a state statute when resolving the conflict issue." (*Banuelos*, *supra*, 219 Cal.App.4th at p. 333.)

*Banuelos* also rejected the defendant's suggestion that the California Supreme Court's decisions in *Ribas v. Clark* (1985) 38 Cal.3d 355 and *Rubin v. Green* (1993) 4 Cal.4th 1187 mandated application of the litigation privilege. "[B]oth addressed statutes that cover a broad spectrum of conduct, none of which specifically relates to litigation. It was only because the facts that gave rise to the causes of action in those cases happened to involve litigation activities that the privilege was implicated. Neither statute 'would be significantly or wholly inoperable if its enforcement were barred when in conflict with the privilege.'" (*Banuelos*, *supra*, 219 Cal.App.4th at p. 335, quoting *Action Apartment*, *supra*, 41 Cal.4th at p. 1246.)

Department of Motor Vehicles (DMV) expressing her concern that, due to the plaintiff's medical history and cognitive deficits, he posed a risk to public safety. In response, the DMV revoked the plaintiff's commercial driver's license. (*Id*. at pp. 1157-1160.) In his lawsuit, the plaintiff alleged a cause of action for breach of contract and tort claims based on violation of the Confidentiality of Medical Information Act (CMIA; § 52 et seq.). The defendants successfully argued in the trial court that the tort claims were barred by the litigation privilege. (*McNair*, at pp. 1160-1161.)

The Court of Appeal easily concluded the plaintiff's tort claims, based on the physician's letter to the DMV, were barred by the litigation privilege. (*McNair*, *supra*, 5 Cal.App.5th at pp. 1163-1164.) The plaintiff, however, relied on a number of the cases discussed, *ante*, for the proposition that the general litigation privilege does not apply when it conflicts with a more specific statute. "Under [that] line of cases, application of the litigation privilege has been deemed inappropriate where the specific statute 'would be significantly or wholly inoperable if its enforcement were barred when in conflict with the privilege.'" (*Id*. at p. 1164, citing *Action Apartment*, *Komarova*, *Begier*, & *Siam v. Kizilbash*.) The *McNair* court rejected the assertion that application of the litigation privilege "would eliminate safeguards governing disclosures of medical information that the Legislature sought to protect in the CMIA and would therefore render the CMIA 'significantly or wholly inoperable.'" (*McNair*, at p. 1165.)

"The CMIA 'was originally enacted . . . "to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information." [Citation.]'" (*McNair*, *supra*, 5 Cal.App.5th at p. 1165,

33

quoting *Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 38.) Section 56.10,

subdivision (c)(14), part of the CMIA, is a "catchall provision," which permits disclosure

of confidential medical information when specifically authorized by law. (*McNair*, at

p. 1165, quoting *Shaddox v. Bertani* (2003) 110 Cal.App.4th 1406, 1414 (*Shaddox*).)

"'It legitimizes a myriad of situations the Legislature may not have cared to spell out, by

establishing the principle of permissive disclosure when specifically authorized by law.'"

(*McNair*, at p. 1165, quoting *Shaddox,* at p. 1414.) "[B]ecause California has a policy of

encouraging reports regarding suspected unsafe drivers," the *McNair* court concluded the

catchall provision of section 56.10, subdivision (c)(14), "must be construed in a way that

will not impede voluntary reports of the type generated by [a doctor], 'reports whose

importance is already recognized and immunized by [the official proceeding privilege

under] section 47, subdivision (b)(3).'" (*McNair*, at p. 1166, quoting *Shaddox*, at

p. 1418.)

"[A] voluntary disclosure of confidential medical information falls within the reach

of [section 56.10,] subdivision (c)(14) if a public policy exists encouraging such disclosure;

the disclosure involves issues of public safety; and it is a communication which would

otherwise be immunized by the litigation privilege. In this case, California clearly has a

policy of encouraging, and sometimes even mandating, reports regarding suspected unsafe

drivers. . . . The [DMV's] proposed decision to revoke or suspend a person's driver's

license is subject to an evidentiary hearing and decision by an administrative officer or

body, as well as review by the courts. (Veh. Code, § 14100 et seq.)' [Citation.] In

addition, [the doctor's] letter clearly implicated issues of public safety, as she was

disclosing a problem that could impair [plaintiff's] ability to perform the public safety duties entrusted to him as a bus driver. Finally, this is a situation where the importance of the report has already been recognized and immunized by the litigation privilege." (*McNair*, *supra*, 5 Cal.App.5th at pp. 1167-1168.) The court concluded the physician's disclosure was authorized by, and not in violation of, the CMIA and held that application of the litigation privilege would not render the CMIA significantly or wholly inoperable. (*McNair*, at p. 1168.)

> 4. Claims under the IFPA for insurance fraud are an exception to the litigation privilege.

We conclude the litigation privilege does not bar Alzayat's claim under the IFPA. First, we have no difficulty concluding Insurance Code section 1871.7 is a more specific statute than the litigation privilege.[13] The litigation privilege "is implicated in *all* judicial and quasi-judicial proceedings" (*Komarova*, *supra*, 175 Cal.App.4th at p. 339, italics added), but the IFPA is limited to a "small subset of those proceedings" (*Komarova*, at p. 339), viz, actions to recover civil penalties for fraud related to claims for insurance benefits. (Ins. Code, § 1871.7, subd. (b).)

Nor do we have any doubt that application of the litigation privilege would thwart rather than promote the legislative purpose behind the IFPA. Whereas in *McNair*

---

[13] Defendants do not address whether the IFPA is a more specific statute than the general litigation privilege, and instead focus their argument on whether application of the privilege will render the IFPA "wholly inoperable." We need not decide whether applying the litigation privilege would completely render the IFPA inoperable because we conclude, *post*, that the privilege would render it *significantly* inoperable. (*Action Apartment*, *supra*, 41 Cal.4th at p. 1246.)

35

application of the litigation privilege supported the public policy of encouraging unfettered disclosures of confidential medical information in the interest of public safety (*McNair*, *supra*, 5 Cal.App.5th at pp. 1167-1168), applying the privilege to fraudulent communications made in support of or in opposition to a claim for insurance benefits would frustrate the remedial purpose of the IFPA.  Civil statues enacted for the protection of the public are to be construed broadly in favor of their protective purpose.  (*Pineda v. Williams-Sonoma Stores*, *Inc*. (2011) 51 Cal.4th 524, 530; *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313.)  The Legislature was "presumably aware of the extant broad litigation privilege in section 47" (*Komarova*, *supra*, 175 Cal.App.4th at p. 340) when it enacted the IFPA to provide civil liability for fraudulent communications related to claims for insurance benefits, including liability for communications that are otherwise at the core of the privilege.  This strongly suggests the Legislature balanced the public interest in preventing insurance fraud with the interest in encouraging free and unfettered communications in litigation, and "struck that balance" in favor of preventing insurance fraud.  (*Begier*, *supra*, 46 Cal.App.4th at p. 885.)  Applying the privilege here would "encour[age] rather than suppress[]" (*Banuelos*, *supra*, 219 Cal.App.4th at p. 332) the type of fraud the IFPA was designed to combat and would upset the legislative balance enshrined in the Act.

Last, we conclude application of the litigation privilege would render the IFPA significantly inoperable.  In its ruling, the trial court cited two examples of automobile insurance fraud that would not necessarily involve contemplated litigation and, therefore, would not trigger the litigation privilege.  We agree there may be various ways of violating

Penal Code section 550, and incurring liability under the IFPA, that do not involve actual or contemplated litigation. But we need not conclude that the litigation privilege would render the IFPA *wholly* inoperable before finding an exception to the privilege. A significant amount of fraud governed by the IFPA will occur during or in contemplation of litigation. Relevant here, false statements made by an employer, witness, or physician, casting doubt on the validity of a legitimate claim for workers' compensation benefits, are made in the context of a quasi-judicial proceeding and absent an exception would be subject to the litigation privilege. (*Harris*, *supra*, 60 Cal.App.4th at pp. 1187-1188.) It is not difficult to imagine other types of insurance fraud that would potentially trigger the protections of the litigation privilege. Applying the privilege to such acts of fraud, in a remedial action under the IFPA, "would effectively render the protections afforded by [the Act] meaningless." (*Persolve*, *supra*, 218 Cal.App.4th at p. 1277.) Therefore, we conclude Alzayat's claims under the IFPA are not barred by the litigation privilege, and the trial court erred by granting judgment for defendants based on the privilege.

C. *The Workers' Compensation Exclusivity Rule Does Not Apply to Alzayat's Claims Under the IFPA.*

In their cross-appeal, defendants argue the trial court should have granted judgment on the pleadings on the alternative theory that Alzayat's IFPA lawsuit is barred by the workers' compensation exclusivity rule. According to defendants, *Thompson*, *supra*, 136 Cal.App.4th 24, on which the trial court relied when rejecting defendant's alterative theory, does not apply to an IFPA claim filed by an employee. We conclude the trial court correctly rejected defendant's alternative argument.

37

The WCA "'provides an employee's exclusive remedy against his or her employer for injuries arising out of and in the course of employment.' [Citation.] The exclusive remedy provision of the act provides, in part, that "'[w]here the conditions of compensation set forth in Section 3600 concur, the right to recover compensation is . . . the sole and exclusive remedy of the employee or his or her dependents against the employer" (Lab. Code, § 3602, subd. (a)), and that "[i]n all cases where the conditions of compensation set forth in Section 3600 do not concur, the liability of the employer shall be the same as if this division had not been enacted" (Lab. Code, § 3602, subd. (c)). The legal theory supporting this exclusive remedy provision "is a presumed 'compensation bargain,' pursuant to which the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort." [Citations.]'" (*Melendrez*, *supra*, 240 Cal.App.4th at pp. 638-639.)

In *Thompson*, *supra*, 136 Cal.App.4th 24, a self-insured employer filed a relator action alleging various physicians participated in a scheme to file false claims for workers' compensation benefits on behalf of the relator's employees, in violation of the IFPA. (*Thompson*, at p. 27.) On appeal from a judgment finding them liable, the defendants argued the relator's claims were barred by the workers' compensation exclusivity rule. (*Thompson*, at pp. 27-28.) The defendants argued the relator's claim was basically a complaint of overbilling, and that Labor Code section 3820 already

38

provided civil penalties for fraudulent practices. (*Thompson*, at p. 29.) The court was not persuaded. "[I]n [Labor Code section 3820] the Legislature expressly acknowledged that other penalties may exist, and it stated that the penalty set forth in subdivision (d) may be imposed 'in addition to any other penalties that may be prescribed by law.' And in subdivision (a) of Labor Code section 3820 the Legislature expressly recognized 'that the conduct prohibited by this section is, for the most part, already subject to criminal penalties pursuant to other provisions of law.'" (*Thompson*, at pp. 28-29, fn. omitted.)

With respect to the IFPA, the court noted the Act "was intended to encompass fraudulent claims for workers' compensation benefits" and "specifically provides for civil penalties for claims for compensation under Labor Code section 3207, which is part of the WCA." (*Thompson*, *supra*, 136 Cal.App.4th at p. 30.) "Lest there be any residual confusion over the authority to proceed," the court noted, "Insurance Code section 1871.7, subdivision (k), makes it clear that the remedies it provides are 'in addition to any other remedies provided by existing law.'" (*Ibid*.) "The express inclusion of workers' compensation claims thus demonstrates the Legislature's intention to allow civil actions under Insurance Code section 1871.7 arising from fraudulent acts made unlawful by Penal Code section 550, notwithstanding applicability of the WCA." (*Id.* at p. 31.)

Defendants contend *Thompson* is limited to the facts in that case, and the holding there has no application to an IFPA claim filed by an *employee*. We need not decide whether *Thompson* is so limited. The workers' compensation exclusivity rule only limits liability "against an employer for any injury sustained *by his or her employees* arising out of and in the course of the employment . . . ." (Lab. Code, § 3600, subd. (a), italics

39

added.)  Because this lawsuit is based on an injury allegedly suffered by the People of the State of California, and was not filed for the purpose of remedying an injury suffered by *Alzayat*, the exclusivity rule simply does not apply.

By definition, a qui tam lawsuit vindicates an injury to the government, not an injury to the relator.  "A *qui tam* statute effectively assigns part of the government's interest to a relator so that the relator has standing to assert *an injury suffered by the government.*  [Citation.]"  (*Stalley ex rel. U.S. v. Catholic Health Initiatives* (8th Cir. 2007) 509 F.3d 517, 521, second italics added.)  "'A *qui tam* relator is essentially a self-appointed private attorney general, and his recovery is analogous to a lawyer's contingent fee.  The relator has no personal stake in the damages sought—all of which, by definition, were suffered by the government.'  [Citation.]  A qui tam action 'is a type of private attorney general lawsuit' [citation], in which 'the qui tam plaintiff stands in the shoes of the state or political subdivision' [citation].  '[A]lthough *qui tam* actions allow individual citizens to initiate enforcement against wrongdoers who cause injury to the public at large, the Government remains the real party in interest in any such action.'  [Citation.]"  (*Strathmann*, *supra*, 210 Cal.App.4th at pp. 500-501.)

As a true qui tam provision, Insurance Code section 1871.7 does not mandate that the relator has suffered his or her own injury.  In addition to a lawsuit by the district attorney or insurance commissioner, "[a]ny interested persons" may bring a lawsuit "for

the person[14] and for the State of California," alleging insurance fraud. (Ins. Code, § 1871.7, subd. (e)(1).) "The action shall be brought in the name of the state." (*Ibid.*) The superior court has jurisdiction over a relator action as long as the allegations or transactions underlying the claim are not already the subject of a proceeding in which the People are a party (Ins. Code, § 1871.7, subd. (h)(1)) and, if the lawsuit is based on allegations or transactions that were previously disclosed in another proceeding or by the media, the interested person is an "original source" of the information (*id.*, subd. (h)(2)(A), (h)(2)(B)). In his complaint, Alzayat did not allege that he was personally harmed by the misrepresentations made by Hebb and adopted by Sunline.[15] Instead, he alleged he is an "interested person" and an "original source" acting on behalf of the People of the State of California, and he prays for civil penalties to be paid to the People.

Taken to its logical conclusion, defendants' position would mean that whenever the district attorney or insurance commissioner takes over an IFPA lawsuit filed by an employee who alleges workers' compensation insurance fraud, those officials would also be forced to pursue civil penalties before the Workers' Compensation Appeals Board. In addition, defendants' argument would mean that a third party whistleblower who files a

---

[14] The fact that an IFPA qui tam lawsuit is brought on behalf of the relator *and* the People does not change our analysis. The successful relator is entitled to a percentage of the penalties ultimately recovered on behalf of the People, as a bounty for bringing the action, so by definition the lawsuit is brought on his or her behalf as well. It does not follow that the lawsuit seeks to remedy a direct harm to the relator, such that the workers' compensation exclusivity rule would require the relator to pursue penalties before the Workers' Compensation Appeals Board.

[15] As noted, *ante*, in footnote 2, Alzayat concedes he was already fully compensated for his back injury.

41

qui tam lawsuit on behalf of the People, based on fraud in the grant or denial of workers' compensation benefits, would similarly be required to pursue civil penalties before the board. We are not convinced that the Legislature intended the workers' compensation exclusivity rule to work such mischief.

Because a qui tam relator does not sue based on his or her own injuries, we conclude an IFPA claim filed by an employee against an employer is not barred by the workers' compensation exclusivity rule.

IV.

DISPOSITION

The judgment is reversed. Mahmoud Alzayat shall recover his costs on appeal.

CERTIFIED FOR PUBLICATION

McKINSTER

Acting P. J.

We concur:

CODRINGTON

J.

SLOUGH

J.

42